**AMERICAN NATIONAL RED CROSS, Plaintiff,**

v.

**ASD SPECIALTY HEALTH CARE, INC., an incorporated division of Amerisource Bergen Corp. d/b/a Oncology Supply, Blood Systems, Inc. d/b/a Biocare, Midwest Drug Supply, and Raymar Worldwide Sales, Inc. Defendants.**

**No. CIV.A.01–0894–CG–L.**

United States District Court, S.D. Alabama, Southern Division.

Oct. 17, 2002.

Dennis D. Murrell, Amy E. Shoemaker, Henry S. Alford, Middleton & Reutlinger, Louisville, KY, Benjamin Max Bowden, Albrittons, Clifton, Alverson & Moody, Andalusia, AL, for Plaintiff.

Dale R. Burmeister, Harvey Kruse, P.C., Troy, MI, Ronald J. Parker, Parker & Adams, P.C., Jackson, MI, William W. Watts, III, Hudson and Watts, L.L.P., Mobile, AL, for Defendant.

## *ORDER*

GRANADE, District Judge.

This cause is before the court on Magistrate Judge Lee's report and recommendation of August 30, 2002 (Doc. 75), the objections thereto of Blood Systems, Inc. (Doc. 76), Raymar Worldwide Sales Inc. ("Raymar") (Docs. 77 & 80), and ASD Specialty Health Care, Inc. ("ASD") (Doc. 78), plaintiff's response to the objections (Doc 79), and the reply of ASD (Doc. 82) and Blood Systems (Doc. 84) to plaintiff's response.

As an initial matter, Blood Systems objects to the submission by the plaintiff, American Red Cross ("Red Cross"), of additional evidentiary materials in connection with the objection. The court did not rely on the evidentiary submissions to which

Blood Systems objects in reviewing and ruling on the objections to the Report and Recommendation. Therefore, Blood Systems' objection to the additional evidentiary submission is moot.

Blood Systems objects to the Magistrate Judge's recommendation that its motion for judgment on the pleadings be denied with respect to plaintiff's claims under the Alabama Uniform Fraudulent Transfer Act ("AUFTA"). ASD objects to the recommendation that its motion to dismiss plaintiff's claims under AUFTA be denied for the same reasons contained in Blood Systems' objection and has submitted additional supporting arguments. ASD also objects to the recommendation that its motion to dismiss be denied as to plaintiff's claim for money had and received. Raymar filed notices of joinder with both Blood Systems' statement of objection and ASD's statement of objection. The court will discuss first plaintiff's claims under AUFTA before turning to plaintiff's claim for money had and received.

### A. Claims Under The Alabama Uniform Fraudulent Transfer Act

Under AUFTA, "transfers" to creditors are fraudulent if they were made "with actual intent to hinder, delay, or defraud any creditor of the debtor," ALA. CODE § 8–9A–4, or if they were made to a creditor whose claim arose before the transfer and the debtor was insolvent or became insolvent and either did not receive equivalent value in exchange for the transfer or the creditor was an insider who had reasonable cause to believe the debtor was insolvent, ALA. CODE § 8–9A–5. Unlike the UCC, which expressly applies to the transfer or sale of "goods" as opposed to "services", AUFTA does not expressly require that the transfer be of "goods." AUFTA defines "transfer" as:

> Every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset

or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance. ALA. CODE § 8–9A–1(13). "Asset" is defined as "[p]roperty of a debtor" with some exclusions that are not applicable here. ALA. CODE § 8–9A–1(2). The magistrate judge's recommendation is based on the conclusion that the distribution of blood products is deemed to be the "rendition of a service" for all purposes, including AUFTA. There is no objection to the finding that the distribution of blood products at issue in this case was the rendition of a service. What defendants take issue with is the magistrate judge's conclusion that, although the distribution constituted a service rather than a sale of goods, nevertheless, such service may be the subject of ownership and considered "property" under AUFTA and, as such, can be fraudulently transferred as defined by the statute. "Property" is defined under AUFTA as:

> Both real and personal property, whether tangible or intangible, and any interest in property whether legal or equitable and includes anything that may be the subject of ownership.

ALA. CODE § 8–9A–1(11).

Defendants cite *Most Worshipful Grand Lodge of Alabama Ancient Free and Accepted Masons v. Allen*, 208 Ala. 292, 94 So. 343 (1922), for the proposition that the rendition of services cannot be the subject of ownership. The case states that the "donation of labor or services presents no analogy to a donation of property which is subject to the claims of creditors, and the rules of law that govern fraudulent conveyances can have no application." *Id.*, at 344. The report and recommendation indicates that this case is not analogous the *Allen* case because the services here were not gratuitous in that the blood products were provided in exchange for remunera-

tion. Defendants read *Allen*'s holding more broadly and believe it to hold that services are not within the reach of creditors even where they were given in exchange for a benefit. They argue that, therefore, the services at issue in this case do not constitute property.

The court agrees with Magistrate Judge Lee that the transaction at issue in this case can be distinguished from the circumstances of the *Allen* case. The agreement between defendants and the "debtor," LA Pharmaceuticals, is analogous to an employment contract under which an employee would have rights to the benefits of employment and the employer would have an interest in the continued services of the employee. These benefits of employment may include rights to particular services, rights to payment or any other right provided for under the contract or agreement. The Supreme Court has explained:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "[A]n employee with a contractual expectation of continued employment has a property interest in that employment." *Anderson–Free v. Steptoe*, 970 F.Supp. 945, 954 (M.D.Ala.1997) (citing *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1151 (11th Cir.1994) and *Board of Regents v. Roth*, 408 U.S. 564, 577–78, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). In this case, unlike the *Allen* case, there is an agreement under which the debtor, LA Pharmaceuticals, was entitled to payment for satisfaction of an antecedent debt in exchange for the services. Prior to the agreement with the defendants, these "services" had been the subject of an agreement between plaintiff and

LA Pharmaceuticals. "Property interests are ... 'defined by existing rules or understandings that stem from an independent source such as state law' and arise only where the plaintiff demonstrates a 'legitimate claim of entitlement.'" *Douglas v. Evans*, 916 F.Supp. 1539, 1547 (M.D.Ala. 1996) (quoting *Polenz v. Parrott*, 883 F.2d 551, 555 (7th Cir.1989)). In *Allen* there was no independent source which gave the debtor a legitimate claim of entitlement or by which the party receiving the services could demand continued services from the debtor. There was no contract or agreement which gave the debtor entitlement to any form of payment for his services; the debtor had donated his services. In this case the debtor was entitled to the "service" as a result of his agreement with plaintiff and then was entitled to the benefit of payment from defendants under its agreement with defendants. These contracts or agreements are the independent source that created a property interest. If there had been a problem with the performance of the "services," defendants could have demanded that the performance problems be remedied or that they be compensated for the problem. Defendants had a property interest in those services as a result of the agreement to transfer those services.

It is true that the "raw rendition of a service" (to use the words of the magistrate judge quoted by defendants) is not an asset. Once it is performed, it is over. If a debtor gratuitously helps a third party by providing a service (assuming it is not accompanied by a significant expenditure of funds) then this court might agree that no "property" was transferred. However, that is not the case here.

Defendants correctly point out that services are not the same as goodwill. As defendants state, while the level of service that a company provides to its customers

might be a component in determining the value of a company's goodwill, services are not the same as goodwill and are normally treated differently in a company's accounting system. The service rendered by LA Pharmaceuticals to defendants would likely have been recorded as an account receivable on the company's books until payment was received. The point remains that both goodwill and services rendered are assets of the company, at least where the company is entitled to payment in return for the services pursuant to an agreement or contract.

Defendants also object to the magistrate judge's use of *Collas v. Brown*, 211 Ala. 443, 100 So. 769 (1924) to support the proposition that services are an aspect of goodwill. This court agrees with defendants that the *Collas* court used "service" in a different context. The meaning of "service" in the *Collas* case is not analogous to what constitutes a "service" in this case. In *Collas*, "service" referred to how the company had generally performed in the past—such as its "promptness, cleanliness, politeness, and furnishings." *Id.* at 770. The *Collas* court was not assigning a value to a specific rendition of service or stating that there was a property interest in a particular service. Nevertheless, this court agrees with the conclusion of the magistrate judge that the rendition of services constitutes an intangible asset in this case and meets the broad definition of property under AUFTA.

## B. Claim for Money Had and Received

■ ASD objects to the recommendation that its motion to dismiss be denied as to plaintiff's claim for money had and received. (Doc. 78)[1]. The basis for ASD's objection is that plaintiff did not allege fraud with sufficient particularity. ASD is correct that fraud must be pled with specificity.

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed. R. Civ. P. 9(b).

> The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior. The application of Rule 9(b), however, must not abrogate the concept of notice pleading. Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1310 (11th Cir.2002) (citations omitted). Plaintiff claims that defendants knew at the time they accepted the blood product at issue from LA Pharmaceuticals that LA Pharmaceuticals had acquired the product from plaintiff under false pretenses. Plaintiff explained in the complaint that LA Pharmaceuticals never intended to pay for the blood products it received from plaintiff and instead intended to use the product and the proceeds from the product "to satisfy the personal debts of its principals and pre-existing company." According to

---

1. The court notes that Raymar Worldwide Sales Inc. filed a notice of joinder with ASD's statement of objection.(Doc. 80). The analysis is the same for either defendant.

the complaint, principals of LA Pharmaceuticals were personally exposed to large amounts of company debt and had been threatened with legal action by the defendants in this case. The complaint alleges that at the time LA Pharmaceuticals placed the order for the blood product, the principals, knowing that LA Pharmaceuticals was insolvent, had already arranged to use the product and proceeds to satisfy antecedent debts. LA Pharmaceuticals allegedly ordered the blood product from plaintiff, representing that it would pay the agreed price for the product, although it never intended to do so. Plaintiff alleges that defendants had knowledge of LA Pharmaceuticals' alleged fraudulent pretenses when they accepted the blood product. Such knowledge may be averred generally. FED. R. CIV. P. 9(b). There is no confusion over what allegedly happened, when the events took place, which transactions are involved, or what LA Pharmaceuticals or its principals and the defendants gained by the transaction. The court finds that the alleged fraud is sufficiently laid out in the complaint and that the specificity requirements of § 9(b) of the Federal Rules of Civil Procedure are satisfied.

## CONCLUSION

Accordingly, after due and proper consideration of all portions of this file deemed relevant to the issues raised, and a *de novo* determination of those portions of the Report and Recommendation to which objection is made, the conclusions of the Report and Recommendation of the Magistrate Judge made under 28 U.S.C. § 636(b)(1)(B) are **ADOPTED** as the opinion of this court and the analysis contained in the Report and Recommendation is **ADOPTED to the extent it is consistent with this order.**

1. Defendant Midwest did not file any pleadings regarding the instant motions to dismiss

## REPORT AND RECOMMENDATION

LEE, United States Magistrate Judge.

This matter is before the Court on defendants' motions to dismiss and for judgment on the pleadings, which have been referred to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Doc. 72). Defendants seek the dismissal of certain counts alleged in plaintiff's complaint. (*See* Docs. 54, 55, 57 and 58). For the reasons stated below, it is recommended that defendants' motions be **DENIED IN PART AND GRANTED IN PART.**

### A.  Procedural History

The pertinent procedural aspects of this action are as follows. On December 20, 2001, plaintiff, American National Red Cross, filed the instant complaint, setting forth causes of action against defendants under the Alabama Uniform Fraudulent Transfer Act, *Ala.Code,* § 8–9A–1, *et seq.* (counts one through four, respectively) and under Alabama common law for "restitution" for "money had and received" (count five). (Doc. 1).

On January 15, 2002, defendant Blood Systems, Inc. d/b/a Biocare ("Blood Systems") filed its answer to the complaint. (Doc. 7). On March 4, 2002, defendant Midwest Drug Supply, LLC ("Midwest") filed its answer.[1] (Doc. 19). On May 9, 2002, defendant Raymar Worldwide Sales, Inc. ("Raymar") filed its answer. (Doc. 50).

On June 6, 2002, defendant ASD Specialty Healthcare, Inc. d/b/a/ Oncology Supply ("ASD"), which has not filed an answer to the complaint, filed its "Motion to Dismiss" (Docs. 54 and 55), pursuant to Rule 12(b)(6), Federal Rules of Civil Pro-

and/or for judgment on the pleadings, and, therefore, is not a party to these motions.

cedure, seeking the dismissal of the counts alleged in the complaint against it under the Alabama Uniform Fraudulent Transfer Act (count one) and for "money had and received" (count five) for failure "to state a claim upon which relief may be granted." *Id.* On June 18, 2002, defendant Blood Systems, which filed an answer to plaintiff's complaint, filed its "Motion for Judgment on the Pleadings" (Doc. 57), pursuant to Fed.R.Civ.P. 12(c), essentially adopting the same positions and arguments set forth by ASD in that party's motion with regard to the statutory (count two) and common law (count five) counts also alleged against it. The next day, on June 19, 2002, defendant Raymar, which also filed an answer to the complaint, filed a similar pleading titled "Notice of Joinder in ASD Specialty Healthcare's Motion to Dismiss" (counts four and five) (Doc. 58), also adopting the positions and arguments set forth by ASD in its motion.[2]

On July 1, 2002, plaintiff filed its response to defendant ASD's motion to dismiss. (Doc. 60). On July 12, 2002, ASD filed its reply to plaintiff's response. (Doc. 62). On July 22, 2002, defendant Blood Systems filed its own reply to plaintiff's response. (Doc. 66). On August 5, 2002, plaintiff filed its response to Blood Systems' reply. (Doc. 71). Thus, the issues addressed in this report and recommendation have been briefed exhaustively by the involved parties. Because the separate motions filed by defendants ASD, Blood Systems and Raymar address similar issues of fact and law, for the sake of simplicity, the undersigned refers to the three motions as one singular "motion."

**B.** *Discussion*

The standards governing the undersigned's assessment of defendants' motion are the same, regardless of whether the motion is framed as one under Fed. R.Civ.P. 12(b)(6) for "failure to state a claim for which relief may be granted," or as one under Fed.R.Civ.P. 12(c) for "judgment on the pleadings." *See, e.g., M.H.D. v. Westminster Schools,* 172 F.3d 797, 802 n. 12 (11th Cir.1999)("[i]f the court concludes that the...statute provides no relief...then it properly dismisses that cause of action for failure to state a claim under Fed.R.Civ.P. 12(b)(6) or 12(c)."); *Burbach Broadcasting Co. of Delaware v. Elkins Radio Corp.,* 278 F.3d 401, 405 (4th Cir.2002).

"In assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must accept all of the facts in the complaint as true, granting the motion only if it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief." *Miller v. U.S. Dept. of Agriculture,* 143 F.3d 1413, 1414 (11th Cir.1998). Similarly, a disposition of claims under Rule 12(c) is appropriate "only if 'it appears beyond a doubt that the plaintiff cannot prove any facts that would support his claim for relief.'" *Forseth v. Village of Sussex,* 199 F.3d 363, 368 (7th Cir.2000). In the context of a Rule 12(c) motion, "where no matters outside the pleadings are presented, the fact allegations of the complaint are to be taken as true... [A] judgment on the pleadings, alone, if sustained, must be based on the undisputed facts appearing in all the

---

**2.** The court notes that Raymar's motion to dismiss asserting that plaintiff has failed to state a claim is untimely as it was filed after Raymar answered. Fed.R.Civ.P. 12(b) provides that "[e]very defense... shall be asserted in the responsive pleading [or]... by motion.... [a] motion making any of these defenses shall be made before pleading".

*Id.* However, Fed.R.Civ.P. 12(h)(2) provides that "[a] defense of failure to state a claim upon which relief can be granted ... may be made ... by motion for judgment on the pleadings." *Id.* Therefore, the undersigned treats defendant Raymar's motion as a Rule 12(c) motion for judgment on the pleadings.

pleadings." *Stanton v. Larsh*, 239 F.2d 104, 106 (5th Cir.1956).[3]

### 1. *Allegations under the Alabama Uniform Fraudulent Transfer Act*

In Counts One, Two and Four in its complaint, plaintiff alleges that defendants ASD, Blood Systems and Raymar violated the Alabama Uniform Fraudulent Transfer Act, *Ala.Code*, § 8–9A–1, *et seq.* ("AUF-TA"). "The AUFTA, §§ 8–9A–1 through –12, Ala.Code 1975, provides that certain transfers 'made by a debtor' may be found void or voidable as to creditors. The purpose of the AUFTA is to prevent fraudulent transfers of property by a debtor who intends to defraud creditors by placing assets beyond their reach." *Thompson Properties v. Birmingham Hide & Tallow Co., Inc.*, 839 So.2d 629, 2002 WL 1353361, *3 (Ala.2002).

Plaintiff alleges that, during 1999, it entered into an arrangement with an individual named Peter Woolley and a company with which he was affiliated, LA Pharmaceutical, to ship in excess of $5,000,000.00 in blood product to Woolley/LA Pharmaceutical.[4] According to plaintiff, Woolley/LA Pharmaceutical actually were insolvent at that time and never intended to pay plaintiff for the blood product. Plaintiff alleges that, upon receipt of the blood product from plaintiff, Woolley/LA Pharmaceutical immediately forwarded various portions of the product to defendants, for purposes of satisfying, in whole or in part, pre-existing debts owed to defendants by Woolley/LA Pharmaceutical. Plaintiff asserts that, at all relevant times, defendants knew that Woolley and/or LA Pharmaceutical had received the product (or, in Raymar's case, proceeds from the sale of the product) from plaintiff under fraudulent pretenses, and that, in turn, defendants' receipt of those products (or proceeds) in full or partial satisfaction of pre-existing debts owed to them make those transfers subject to the rights afforded to plaintiff by the AUFTA. In this regard, common to the allegations is that defendants ASD, Blood Systems and Raymar "had actual and constructive notice that the transfer was not made by LA Pharmaceutical and Peter Woolley in good faith", had "actual knowledge" that Woolley/LA Pharmaceutical were "insolvent", and "knew, or should have known, that LA Pharmaceutical and Mr. Woolley had no method or means to pay the Red Cross product which was shipped to them [in satisfaction of antecedent debts]." (Doc. 1, at 7, 9, 10, 11 and 13).

In the instant motion, defendants ASD, Blood Systems and Raymar seek the dismissal of the AUFTA claims against them on the theory that the blood product transferred from Woolley/LA Pharmaceutical to defendants is not subject to the rights and remedies provided by the AUFTA. In sum, defendants argue that, under Alabama law, blood products may not be construed as "property" transferred fraudulently under the AUFTA.

The AUFTA proscribes the fraudulent transfer of "assets," which are defined as "property of a debtor." *Ala.Code* § 8–9A–1(2). In turn, "property" is defined to be

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**4.** The pleadings in this action reflect that there may have been other individuals or

business entities affiliated with Woolley and LA Pharmaceutical which were involved in the transactions in dispute. However, for sake of simplicity, the undersigned refers to the direct recipients of the blood product from plaintiff as "Woolley/LA Pharmaceutical." Neither Woolley, nor LA Pharmaceutical, nor any affiliated individual or entity, is a defendant in this action.

"[b]oth real and personal property, whether tangible or intangible, and any interest in property whether legal or equitable and includes anything that may be the subject of ownership." *Ala.Code* § 8–9A–1(11). The AUFTA's definition of "property" is intended to be broad in scope, and, as reflected in the official comment to the statute, was amended in 1989 to achieve that very purpose. According to the comment, "[t]he definition of property is amended. The Uniform Act simply defined property as anything that may be the subject of ownership. The Alabama Act includes this language; however, it adds other language in order to give the term 'property' a broad meaning and to use language similar to the Alabama Probate Code . . . ." *Ala.Code* § 8–9A–1 official comment.[5]

Defendants' argument that blood products are not "property" under the AUFTA is based upon language included in a separate series of statutes enacted under the auspices of the Alabama Commercial Code, which generally governs matters pertaining to the commercial sale of "goods." *See Ala.Code* § 7–1–101 *et seq.* In particular, defendants point to language commonly referred to across the nation as a "blood shield statute," intended to remove blood and related products from the definition of "goods" which are subject to the provisions of state commercial codes. The general purpose of a blood shield statute is to prevent blood from being "treated as a product for purposes of strict liability . . . consistent with the underlying purpose of the . . . blood shield statute, which [is] to facilitate a readily available supply of blood by limiting liability to defects caused by negligence." *Validity, Construction, and Application of Blood Shield Statutes*, 75 A.L.R.5th 229, § 8 (2000).

The Alabama blood shield statute provides that:

> Procuring, furnishing, donating, processing, distributing, or using human whole blood, plasma, blood products, blood derivatives, and other human tissues such as corneas, bones or organs for the purpose of injecting, transfusing, or transplanting any of them in the human body is declared for all purposes to be the rendition of a service by every person participating therein and whether any remuneration is paid therefor is declared not to be a sale of such whole blood, plasma, blood products, blood derivatives, or other human tissues.

*Ala.Code* § 7–2–314(4). This section was amended in 1969 to include the blood shield language, approximately twenty years before the Alabama legislature broadened the definition of "property" for purposes of the AUFTA statutory scheme. *See Ala.Code* § 7–2–314 official comment. According to defendants, because the blood shield statute provides that the distribution of blood products is "for all purposes the rendition of a service", such is incompatible with also defining such items as "property" under the AUFTA.

Indeed, defendants are correct in asserting that, because the distribution of blood products is deemed to be the "rendition of a service" "for all purposes", such purposes necessarily include the purposes underlying other Alabama statutory schemes, including the AUFTA. In *Wilson v.*

**5.** In Alabama, "[i]t is a familiar canon of statutory construction that 'where there is doubt as to the meaning and intent of a statute by reason of the language employed, or arising from the context, courts may look to the history, conditions which lead to that enactment, the material surrounding circumstances, the ends to be accomplished, and evils to be avoided or corrected, in order that the legislative intent be ascertained and given effect, if possible.'" *Eagerton v. Graves*, 252 Ala. 326, 40 So.2d 417, 422 (1949)(quoting *Henry v. McCormack Bros. Motor Car Co.*, 232 Ala. 196, 167 So. 256, 257 (1936)).

*American Red Cross,* 600 So.2d 216 (Ala. 1992), the Alabama Supreme Court held that the blood shield statute's characterization of the distribution of blood products as the "rendition of services" necessarily is applied to actions other than those arising strictly under the Alabama Commercial Code. The court stated:

> Under the rules of statutory construction, this Court is bound to interpret the unambiguous language of a statute to mean what it says. *Coastal States Gas Transmission Co. v. Alabama Public Service Comm'n,* 524 So.2d 357 (Ala. 1988). When drafting § 7–2–314, our legislature specifically used the language "for all purposes." Applying our rules of statutory construction, this Court holds that the legislature intended § 7–2–314(4) to be applicable for all purposes, including negligence actions, breach of contract actions, and actions brought under the [Alabama Extended Manufacturer's Liability Doctrine].

*Wilson,* 600 So.2d at 218. *See also State of Alabama v. Community Blood and Plasma Service, Inc.,* 48 Ala.App. 658, 267 So.2d 176, 179 (1972)("[t]he language of this statute is clear and unambiguous, and while it was obviously not intended to amend or specifically exempt items from the provisions of the sales tax, it is clearly a legislative expression that the activity of 'procuring, furnishing, donating, processing, distributing, or using human whole blood, plasma, blood products, etc.', is to be a service by every person participating therein.").

The undersigned concludes that, based upon the explicit language used in the Alabama blood shield statute, that it applies "for all purposes", as well as the interpretation of Alabama courts consistent with the same, the blood shield statute applies to plaintiff's cause of action under the AUFTA. Thus, in the instant action, the distribution of "plasma derivative products" either by plaintiff to Woolley/LA Pharmaceutical, or, in turn, from them to defendants, was "the rendition of a service" rather than the transacting of "goods." [6]

■ However, this determination is not conclusive with regard to the issue of whether, under Alabama law, a "rendition of services" may be the "subject of ownership" under the AUFTA. Defendants argue that a "service" is not subject to ownership and cannot be transferred. For several reasons, defendants fail to sustain their burden of persuasion that a rendering of services cannot in some manner be the "subject of ownership", in light of the broad definition of "property" set forth in section 8–9A–1(11) of the AUFTA (property is defined to be "[b]oth real and personal property, whether tangible or intangible, and *any* interest in property whether legal or equitable and includes *anything that may be the subject of ownership.*")(emphasis added).

First, defendants, as the burdened movants with respect to their motion, cite no authority holding that a "rendition of services" cannot be the "subject of ownership". In addition, the undersigned's own research has not uncovered support for this proposition, in the context of either Alabama law or federal law, concerning commercial transactions or fraudulent transfers.

Second, contrary to defendants' restrictive view of the implications of the phrase

---

6. The undersigned does not address in detail defendants' claim that plaintiff is "judicially estopped" from asserting that the Alabama blood shield statute is not applicable to the AUFTA, because it is determined herein that, in accordance with *Ala.Code* § 7–2–314(4), the distribution of blood products is a "rendition of a service" "for all purposes," including the AUFTA.

"rendition of a service", in reality, the law recognizes that one is capable of possessing an ownership interest in the rendering of a service. Just one example suffices to make this point. It is beyond dispute that the value of the goodwill of a private business is, to a significant extent, a reflection of the worth of the service-related component of the business. In Alabama,

"Goodwill" has been defined as the advantage or benefit acquired by a business beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement it receives from constant and habitual customers, on account of its local position, common celebrity, reputation for skill, affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices. *See Collas v. Brown,* 211 Ala. 443, 100 So. 769 (1924); *see, also,* 38 Am.Jur.2d Goodwill § 1 (1968). *Goodwill is property of an intangible nature* and constitutes a valuable asset of the business of which it is a part, unless in a particular instance it is too uncertain and contingent in nature to be appraised. 38 Am.Jur.2d, *supra,* § 3. It is well settled that goodwill, *being property,* is transferable and may be bought and sold in connection with the sale of a business; it is not essential, however, that the contract for the sale of a business expressly mention the goodwill of the business. Covenants not to compete that are designed to protect the goodwill of a business being sold imply a sale of the goodwill. 38 Am.Jur.2d, *supra,* §§ 9, 10; *Yost v. Patrick,* 245 Ala. 275, 17 So.2d 240 (1944).

*Gilmore Ford, Inc. v. Turner,* 599 So.2d 29, 31 (Ala.1992)(emphasis added).

Moreover, nearly eighty years ago, the Alabama Supreme Court observed that the past rendition of a service is recognized to be an aspect of a business's goodwill, which may be the subject of ownership:

Studying the question on principle as applied to a café business, it may be said the good will sold was the lure of the place for the public seeking that *service.* Entering into its making was the name, the location, the reputation as to quality, quantity, and prices of food, the *service,* including promptness, cleanliness, politeness, and furnishings, the general atmosphere, including the effect of the crowd of pleased customers, and the sheer habit of going to that place. It is unquestioned that good will may constitute a leading element of value in a going business. In creating such good will, the personal presence, reputation, management, and manner of the seller may have greatly contributed.

*Collas,* 100 So. at 770 (emphasis added). *See also Ala.Code* § 8–1–1(b)("[o]ne who sells the good will of a business may agree with the buyer and one who is employed as an agent, servant or employee may agree with his employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city, or part thereof so long as the buyer, or any person deriving title to the good will from him, or employer carries on a like business therein."); *Levitt Corp. v. Levitt,* 593 F.2d 463, 468 (2nd Cir.1979)("[g]oodwill is a valuable property right derived from a business's reputation for quality and service.")(citing *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 412–13, 36 S.Ct. 357, 360, 60 L.Ed. 713 (1916)); *Kershaw v. Knox Kershaw, Inc.,* 523 So.2d 351, 358 (Ala.1988)("an individual stockholder may sell the good will of a corporation in proportion to his interest in that corporation."). *See also Martin's Aquarium, Inc. v. Zisholtz,* 225 B.R. 868, 876 (Bkrtcy. E.D.Pa.1998)(for purposes of a fraudulent transfer under bankruptcy law, the service

component of a business is an "asset" which may have "some considerable value, even if that value is created entirely by the [d]ebtor's personal expertise.").

Third, defendant Blood Services states that "[a] service contract is an asset that can be transferred and which has some benefit to the contractual parties or their transferees. A service, in and of itself, is not an asset. It cannot be transferred. The obligation to fulfill a service (i.e. a service contract) can obviously be transferred, but a service, itself, cannot." (Doc. 66, at 8). This argument fails because neither the AUFTA nor the Alabama blood shield statute treats differently the raw rendition of a service (*i.e.,* independent of any promise or contract reflecting the same) and a promise or contract memorializing the rendition of a service. The language used in the blood shield statute is merely that the distribution of blood products is, "for all purposes", the "rendition of a service". As explained *supra,* this characterization is for the simple purpose of ensuring that blood products are not treated as "goods" for purposes of enforcement of the Alabama Commercial Code. In many commercial situations, rights and obligations relating to the rendition of services are committed to writing in some manner, such as a contract. Defendants read the language "rendition of services" in an extremely restrictive manner, not supported by authority.[7]

Fourth, defendants' preferred interpretation of the interplay between the AUF-

TA and the Alabama blood shield statute unnecessarily would result in the AUFTA's broad definition of "property" being severely restricted, and perhaps overridden, in all circumstances concerning the distribution of blood products. The undersigned finds no support for treating a "rendition of services" under the Alabama Commercial Code and something that is the "subject of ownership", defined broadly under the AUFTA, as strictly mutually exclusive propositions. In interpreting Alabama law, "[o]ur task...is to resist 'finding' meanings in statutes when those meanings would contravene the very wording of the statutes themselves." *American Liberty Insurance Company v. AmSouth Bank,* 825 So.2d 786, 2002 WL 64629, *6 (Ala.2002)(unpublished). "Statutes should be construed together so as to harmonize the provisions as far as practical." *Ramsey v. First Family Financial Services, Inc.,* 718 So.2d 658, 659 (Ala. 1998) (citations omitted).

Therefore, based on the above, defendants ASD, Blood Systems and Raymar have failed to sustain their burden that plaintiff's claims against them under the AUFTA are due to be dismissed.

2. *Allegations under Common Law Theory of "Money Had and Received".*

In Count Five of the complaint, plaintiff seeks restitution against all defendants for "money had and received" (*i.e.* "unjust enrichment") (Doc. 1). In the instant motion, defendants ASD, Blood Systems and Ray-

---

7. The Court acknowledges that defendants cite *Most Worshipful Grand Lodge of Alabama Ancient Free and Accepted Masons v. Allen,* 208 Ala. 292, 94 So. 343 (Ala.1922), which held that "a donation of labor or services presents no analogy to a donation of *property* which is subject to the claims of creditors, and the rules of law that govern fraudulent conveyances can have no application." *Id.,* at 344 (emphasis in original). This case stands for the proposition that a creditor does

not have a right to appropriate the services of a debtor for satisfaction of a debt therefore a donation of services, as a gratuitous act, is not subject to the law governing fraudulent conveyances. This case does not address when a rendition of services is provided in exchange for remuneration, which is the circumstance presented in the instant action. As set forth *supra,* a rendition of services on occasion may be the subject of ownership.

mar assert that, "the allegations of the complaint are directly contrary to [the] predicate for liability for money had and received." (Doc. 55, at 11). In sum, defendants appear to base their argument on the absence of any "obligation, in law or equity, running from the defendant to the plaintiff." (Doc. 55, at 10).

Alabama law is settled that the "essence" of a cause of action for "money had and received is that a plaintiff can prove facts showing that defendant holds money which, in equity and good conscience, belongs to plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." *Dickinson v. Cosmos Broadcasting, Inc.*, 782 So.2d 260, 266 (Ala.2000)(quoting *Hancock-Hazlett Gen. Constr. Co. v. Trane Co.*, 499 So.2d 1385, 1387 (Ala.1986)). "[T]he remedy of restitution for 'money had and received'...requires a mistake on the part of the donor, or wrongful conduct on the part of the recipient of a benefit." *Jordan v. Mitchell*, 705 So.2d 453, 460 (Ala.Civ.App. 1997). A claim for "money had and received" is not limited to an exchange of "money," literally, but can encompass "other pecuniary gain" by the defendant. *Id.* In this regard, a claim may be for "property, or anything else...received as the equivalent of money...." *Farmer's Bank & Trust Co. v. Shut & Keihn*, 192 Ala. 53, 68 So. 363, 365 (1915). Moreover, "privity of contract is not necessary to support" a claim of money had and received. *Id.* "To support the action for money had and received, it is not an essential factor that there is privity of contract between the litigant parties. The law implies a promise to pay the person rightfully entitled to receive the money." *Alabama Dry Dock & Shipbuilding Co. v. Ward*, 32 Ala.App. 535, 27 So.2d 710, 713 (1946), *cert. denied*, 248 Ala. 371, 27 So.2d 716 (1946).

In its complaint, although there are some differences in the facts alleged with respect to defendants ASD, Blood Systems and Raymar, plaintiff alleges that these defendants at all relevant times knew that Woolley/LA Pharmaceutical had received the blood product from plaintiff under fraudulent pretenses. Common to the separate allegations against defendants in this regard is that defendants "had actual and constructive notice that the transfer was not made by LA Pharmaceutical and Peter Woolley in good faith," had "actual knowledge" that Woolley/LA Pharmaceutical were "insolvent," and "knew, or should have known, that LA Pharmaceutical and Mr. Woolley had no method or means to pay the Red Cross product which was shipped to them [in satisfaction of antecedent debts]." (Doc. 1, at 7, 9, 10, 11 and 13). In particular, plaintiff alleges that defendants received "Red Cross product which had been wrongfully and fraudulently converted by LA Pharmaceutical and Peter Woolley....[and] then sold the Red Cross product and received either money or its equivalent from that sale." (Doc. 1, at 14).

For purposes of defendants' motion, the undersigned assumes as true the allegations set forth in plaintiff's complaint. Assuming the facts alleged to be true, defendants accepted the blood product at issue from Woolley/LA Pharmaceutical, knowing at all times that Woolley/LA Pharmaceutical had acquired the product from plaintiff under fraudulent pretenses. Such facts, if proven, would appear, at the very least, to represent "wrongful conduct on the part of the recipient of a benefit." *Jordan*, 705 So.2d at 460. Defendants assert that, "[n]one of the allegations in the complaint would support a conclusion that ASD owed or assumed any duty to Red Cross, or ever knew of any duty or obligation owed to Red Cross by Woolley or his companies." (Doc. 55, at 11). Defendants assertion in this regard ignores plaintiff's allegation that defendants had knowledge that Woolley/LA Pharmaceutical did not receive the

blood products from plaintiff in good faith, that Woolley/LA Pharmaceutical was insolvent at that time, and that defendants knew that Woolley/LA Pharmaceutical did not intend to pay plaintiff for the blood product. (Doc. 1).

However, defendant Blood Systems also asserts that the AUFTA has "displaced" the common law claim of "money had and received" in Alabama, and that, consequently, plaintiff may not sustain a cause of action pursuant to it.[8] Section 8–9A–10 of the AUFTA states that: "Unless displaced by the provisions of this chapter, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement its provisions." *Id.*

With respect to a similar provision contained in the Alabama Commercial Code, the Alabama Supreme Court recently reiterated that:

> Whether a statutory provision has "displaced" a common-law cause of action under section 7–1–103 will depend to a great degree on (1) the levels of identity between, and specificity of, both the common-law cause of action being asserted and the statutory provision, and (2) the extent to which the statutory language evidences that the provision's scope of operation affirmatively excludes a necessary basis of the common-law cause of action. *See generally C & N Contractors, Inc. v. Community Bancshares, Inc.*, 646 So.2d 1357, 1361–63 (Ala.1994)(discussing, without deciding, whether Ala.Code § 7–3–405(1) displaces certain common-law claims of negligence and wantonness). Under

§ 7–1–103, when a statute provides a cause of action relating to a specific factual situation in a specific manner, then any common-law cause of action based upon a factual situation so materially identical that it is clearly within the specific scope of the provision must be said to have been "displaced," especially if it is in some way affirmatively excluded by the statutory language.

*American Liberty Insurance Co.*, 825 So.2d 786, 794–95.

Applying the test in Alabama for whether a statute has "displaced" a common law cause of action, as set forth in *American Liberty Insurance Co., supra*, the undersigned compares the respective "levels of identity" between the AUFTA and the common law cause of action for "money had and received." Regarding the AUFTA:

> Two types of fraudulent transfers, actual and constructive, are within the scope of the Alabama Fraudulent Transfer Act, *Ala.Code* 1975, § 8–9A–1 *et seq. See McPherson Oil Co. v. Massey*, 643 So.2d 595 (Ala.1994). An actual fraudulent transfer is one made by a debtor who transfers assets "with actual intent to hinder, delay, or defraud any creditor of the debtor." *Ala.Code* 1975, § 8–9A–4(a). The trial court considers several factors in determining whether the debtor possessed the requisite intent, including to whom the transfer was made, the amount of assets transferred, and the financial condition of the debtor before and after the transfer. *Ala.Code* 1975, § 8–9A–4(b); *McPherson Oil, supra.* A constructive fraudulent transfer occurs when a debtor transfers assets to another without consideration, and the debtor was, or became, insolvent at the time of

---

**8.** Although defendants ASD and Raymar did not argue the issue of "displacement" in its briefs, for purposes of the assessment of plaintiff's claims, and defendants' assertions, under Fed.R.Civ.P. 12(b)(6) and (c), the undersigned considers the issue of displacement with respect to defendants ASD, Blood Systems and Raymar.

the transfer. *Ala.Code* 1975, § 8–9A–5(a); *McPherson Oil, supra.*

*Varner v. Career Search, Inc.*, 662 So.2d 273, 276 (Ala.Civ.App.1994). With respect to the common law remedy of "money had and received," again, the plaintiff must prove facts showing that defendant holds money which, in equity and good conscience, belongs to plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." *Dickinson*, 782 So.2d at 266. "[T]he remedy of restitution for 'money had and received'...requires a mistake on the part of the donor, or wrongful conduct on the part of the recipient of a benefit." *Jordan*, 705 So.2d at 460.

Thus, liability under the AUFTA is focused largely on the specific actions of the transferor of the subject property, who must be demonstrated to have "intentionally" effected a fraudulent transfer of the subject property, or to have "constructively" effected such a transfer by disposing of the subject property gratuitously despite being insolvent. The remedy of "money had and received" is equitable in nature, with its focus on the wrongful possession of the subject property by the transferee, which could occur even due to a mere mistake.

The AUFTA statutory scheme includes four different types of "fraudulent transfers" upon which liability may be predicated. *See Ala.Code* § 8–9A–4(a); § 8–9A–4(c); § 8–9A–5(a); and § 8–9A–5(b). In the present action, plaintiff alleges that defendants violated the AUFTA generally, and does not cite specifically to any particular provision defendants, collectively or individually, are alleged to have violated. Only in plaintiff's "Response to Defendant Blood System, Inc.'s Reply Brief" (Doc. 71), which is plaintiff's second brief with respect to the instant motion, does plaintiff refer to any particular provision of the AUFTA it may be suing under in this action. On page three of this brief, plaintiff refers briefly to section 8–9A–4(a) of the AUFTA, but does not indicate whether this particular section is the only one in which it pursues relief.

For purposes of the Court's assessment of defendants' motion under Fed.R.Civ.P. 12(b)(6) and (c), the Court must take the allegations as stated in the complaint at face value. Some of the facts alleged against defendants ASD, Blood Systems and Raymar, respectively, contain some differences which are significant in assessing which particular provision(s) of the AUFTA either party is alleged to have violated. With respect to defendant ASD, in pertinent part, plaintiff alleges that "Peter Woolley and LA Pharmaceutical further transferred Red Cross product with a fair market value of $3,828,000 to [ASD] for which [ASD] has only paid $1,404,668.32." (Doc. 1, at 7). However, no similar allegation—that the transferee paid less than the fair value of the subject property—is made with respect to defendants Blood Systems or Raymar. In pertinent part, plaintiff merely alleges that Blood Systems received blood product "with a fair market value of $352,205.20" from Woolley/LA Pharmaceutical "to satisfy...antecedent debts." (*Id.*, at 9) and that Raymar received "proceeds from the sale of Red Cross product with a fair-market value of $848,000...to satisfy the antecedent debts...." (*Id.*, at 13).

For purposes of this report and recommendation, based on the facts alleged with respect to defendant ASD, plaintiff's complaint can be construed to allege that ASD is subject to the provisions of any, or all, of three different sections of the AUFTA. First, the complaint may be construed to allege a violation of section 8–9A–4(a), which provides that "[a] transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the

debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* In sum, plaintiff alleges that Woolley/LA Pharmaceutical never intended to pay plaintiff for the blood product in question. Second, the complaint may be construed to allege a violation of section 8–9A–4(c)(2), which provides that "[a] transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor...[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." *Id.* In sum, plaintiff alleges that Woolley/LA Pharmaceutical knew it was incapable of paying its debts, and that ASD paid less than the fair market value of the blood it received from Woolley/LA Pharmaceutical. Third, the complaint may be construed to allege a violation of section 8–9A–5(a), which provides that "[a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer." *Id.* Again, plaintiff alleges that Woolley/LA Pharmaceutical received less than fair market value from the blood product it transferred, and alleges that Woolley/LA Pharmaceutical was insolvent at all relevant times.

■ The undersigned determines that the AUFTA cannot be deemed to "displace" the common law claim of "money

had and received" with regard to the allegations against defendant ASD. In light of the facts alleged by plaintiff in this action, it is conceivable that ASD could be found not liable for restitution "for money had and received" if ASD is found to have engaged in no "wrongful conduct." *Jordan,* 705 So.2d at 460. Nevertheless, under two of the three sections of the AUFTA which appear to apply to ASD, section 8–9A–4(c)(2) and section 8–9A–5(a), the transfer of blood products to ASD potentially could be voided, at least to some extent, despite ASD proving that it acted in "good faith" with regard to the transactions at issue. Of all of the sections of the AUFTA which may form a predicate for liability, as referred to, *supra,* only transfers arising under section 8–9A–4(a) allow a transferee to totally escape application of the AUFTA when the transferee is shown to have received the subject property in "good faith." In this regard, section 8–9A–8(a) provides that transfers only under section 8–9A–4(a) are "not voidable...against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee who took in good faith." *Id.*

Thus, because the facts alleged in this action with regard to defendant ASD conceivably could result in ASD not being found liable for restitution to plaintiff because it engaged in no wrongdoing, but nevertheless being subject to at least two provisions of the AUFTA despite a showing of good faith, the AUFTA cannot be deemed to displace the claim of "money had and received" in this action with regard to ASD.[9]

However, the undersigned determines that, in contrast to the facts alleged with

---

9. The undersigned notes that, with regard to any transfer subject to its provisions, including but not limited to transfers subject to section 8–9A–4(a), the AUFTA provides some protection for any "good faith transferee" with respect to "the extent of the value given

the debtor for the transfer...." *Ala.Code* § 8–9A–8(d)(providing for either "[a] lien on the right to retain any interest in the asset transferred," or "[a] reduction in the amount of the liability on the judgment."). Neverthe-

regard to defendant ASD, plaintiff's complaint can be construed to allege that defendants Blood Systems and Raymar are subject only to the provisions of section 8–9A–4(a), which provides that "[a] transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* Again, plaintiff does not allege that Blood Systems or Raymar paid less than the fair value of the subject property. In pertinent part, plaintiff merely alleges in its complaint that Blood Systems received blood product "with a fair market value of $352,205.20" from Woolley/LA Pharmaceutical "to satisfy...antecedent debts", and that Woolley/LA Pharmaceutical never intended to pay plaintiff for the blood product in question (Doc. 1, at 9), and that Raymar received "proceeds from the sale of Red Cross product with a fair-market value of $848,000...to satisfy the antecedent debts...." (*Id.*, at 13). As explained *supra,* transfers subject to section 8–9A–4(a) are "not voidable...against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee who took in good faith." *Id.* In other words, if it is determined that Blood Systems and Raymar acted in good faith when those entities received the blood product (or proceeds

from the blood product), the transfer is not voidable. Therefore, as with the common law action of "money had and received", the recipient's behavior will be determinative.

Accordingly, in this action, the same set of facts demonstrated and proven at trial with regard to defendants Blood Systems and Raymar appear likely to result in those defendants either being held accountable under both the AUFTA and the common law claim of "money had and received," or not being held accountable under either cause of action. It is apparent to the undersigned that, at least with regard to the claims against Blood Systems and Raymar in this action, section 8–9A–4(a) of the AUFTA "provides a cause of action relating to a specific factual situation in a specific manner," which is "so materially identical" to what facts also are necessary to be presented in a common law action in Alabama for "money had and received." *American Liberty Insurance Co.,* 825 So.2d 786, 794–95. In this action, the elements necessary to prove, or disprove, both causes of action against Blood Systems and Raymar largely will hinge upon the intent of Woolley/LA Pharmaceutical, and the good faith of Blood Systems and Raymar. The facts at issue clearly are "within the specific scope" of the AUFTA, warranting a finding of displacement with regard to the claim for "money had and received" against Blood Systems and Raymar.[10] *Id.*

---

less, unlike transfers under section 8–9A–4(a), transfers subjection to other aspects of the AUFTA are subject to being voided, despite a showing of good faith by the transferee.

10. The undersigned acknowledges that there is no explicit language contained within the AUFTA statutory scheme evidencing an intent by the legislature to "affirmatively exclude[ ] a necessary basis of the common-law cause of action" of "money had and received." *C & N Contractors, Inc.,* 646 So.2d at 1361–63. However, the undersigned interprets Alabama

law to not require that the language of a statute specifically refer to its intent to "displace" a particular common law cause of action; otherwise, there would be no point to the requirement that the court engage in a comparison of the respective identities of the statute and common law count at issue. In any event, the language of the AUFTA acknowledges that one or more of its provisions may be construed to displace a common law cause of action. Section 8–9A–10 of the AUFTA states that, "[u]nless displaced by the provisions of this chapter, the principles of law

Therefore, based on the above, defendant ASD has failed to sustain its burden that plaintiff's claim against it with regard to the common law tort of restitution for "money had and received" is due to be dismissed. However, defendants Blood Systems and Raymar have sustained their burden of showing that plaintiff's claim against them for "money had and received" are due to be dismissed, because those claims are displaced by the AUFTA for purposes of this action.

## D. *Conclusion*

Accordingly, it is **RECOMMENDED** that: (1) defendant ASD's motion to dismiss under Fed.R.Civ.P. 12(b)(6) be denied in full; (2) that defendant Blood Systems' motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) be denied with regard to the claim against it under the Alabama Uniform Fraudulent Transfer Act (count two); and (3) that defendant Blood Systems' and defendant Raymar's motions for judgment on the pleadings under Fed.R.Civ.P. 12(c) be granted with regard to the claims against them for restitution for "money had and received" (count five).